UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| MELINDA ANTONUCCI, CASEY MATHIEU, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     Case No. 2:24-cv-783 |
| | ) |
| CHRISTOPHER WINTERS, in his personal and official capacity as Commissioner of the Vermont Department for Children and Families; ARYKA RADKE, in her personal and official capacity as Deputy Commissioner, Vermont Department for Children and Families, Family Services Division; STACEY EDMUNDS, in her personal and official capacity as Director, Residential Licensing & Special Investigations, Vermont Department for Children and Families; and PAULA CATHERINE, in her personal and official capacity as a Licensing Officer, Residential Licensing & Special Investigations, Vermont Department for Children and Families, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiffs Melinda Antonucci and Casey Mathieu bring this action claiming violations of their rights under the First and Fourteenth Amendments to the United States Constitution. The

case centers on Plaintiffs' license to serve as foster parents in Vermont.  Although Plaintiffs were initially granted a license, they have allegedly been retaliated against by Defendants after expressing their unwillingness to assist with the social and medical transitioning of a potential transgender foster child.  Now before the Court is Defendants' motion to dismiss.  The motion argues official capacity immunity; lack of personal involvement; qualified immunity; and failure to state a plausible retaliation claim.  For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

## Factual Background

For purposes of the pending motion to dismiss, the factual allegations in Plaintiffs' Verified Complaint and its attached exhibits are accepted as true.  The Verified Complaint alleges that Plaintiffs Melinda Antonucci and her husband Casey Mathieu, parents of three children, are active in their Christian church and local community.  They were also previously licensed as a foster family by the Vermont Department for Children and Families ("DCF").

Families who seek to provide foster care in Vermont must complete an application and pass a background check.  DCF asks, among other things, whether an applicant can "care for children who may come from different backgrounds, have a different religion, identify as LGBTQ, have a disability, etc."  ECF No. 1

at 10, ¶ 54.  DCF also reportedly tries "to recruit, train, support, and retain foster families who are LGBTQ affirming and supporting" because "LGBTQ children . . . will be placed in an LGBTQ affirming" home.  *Id.*, ¶ 55.

In or about February of 2023, Plaintiffs applied for a foster care license.  On the license application, they indicated they would be willing to foster an LGBTQ child.  During the first required home inspection, Melinda Antonucci informed a DCF employee that she and her husband Casey had some hesitation about fostering a transgender-identifying child, but did not go into specifics.  The DCF employee allegedly advised Plaintiffs to avoid expressing their hesitation during the next home inspection, opining that DCF might not issue them a license.

On October 19, 2023, DCF employee Paula Catherine, one of the Defendants in this case, contacted Plaintiffs by email to schedule the second required home inspection.  In that email, Catherine asked Melinda and Casey to complete a supplemental training module.  The module reportedly covered affirming a foster child's transgender identity and facilitating the provision of medical and psychological treatment to aid in the child's transition if the child requested it.  Catherine indicated that this supplemental training was necessary given DCF's perception that Plaintiffs were hesitant to foster a transgender-identifying child.

When Catherine arrived at Plaintiffs' home later that day, she reportedly stressed that all homes must be "affirming" of a child's transgender identity.  *Id.* at 14, ¶ 86.  Melinda expressed reservations about facilitating psychological and medical treatment for a transgender-identifying child if requested.  Because Melinda and Casey were looking to foster a younger child close to their five-year-old son's age, they informed Catherine that they did not think the issue of a transgender-identifying child would arise.

In January 2024, DCF approved Plaintiffs' foster care application and issued them a license.  The following month, Melinda and Casey began fostering an eight-year-old boy.  The placement was on an emergency basis and lasted for approximately two weeks.

In February 2024, Melinda posted on her personal Facebook account her support for a petition calling on the local school district to inform a child's parents prior to assisting that child's social transition to a new gender identity at school. Caseworkers with DCF became aware of the post and opened an investigation.  On April 1, 2024, Catherine emailed Melinda requesting to speak to her about the petition.  In a phone call later that day, Catherine allegedly asked Melinda about her beliefs on transgender-identifying children, including her willingness to use preferred names.  Melinda explained that

4

while she was not opposed to fostering a transgender-identifying child, she said she would not facilitate a child's medical transition or require her five-year-old son to use the hypothetical foster child's preferred names and pronouns.

The Verified Complaint alleges that, because DCF generally allows parents to consider a specific child before agreeing to foster, Melinda did not think her position would present a problem since she and Casey could choose not to foster a transgender-identifying child.  The Verified Complaint further alleges that DCF allows potential foster families to "say no" to a placement, stating in the DCF Foster Parent Guide that "[t]he ability to say no [to a placement] is one of the most important skills you can have as a foster parent."  *Id.* at 12, ¶ 65.

On April 4, 2024, Catherine emailed Melinda and informed her that "since [Melinda] will not foster a transgender child and discuss they/them pronouns with [the] child, then [DCF does not] know how [it] can move forward with fostering given the inability to predict any foster child's journey with their own identity."  *Id.* at 16, ¶ 103.  Catherine gave Melinda the option to either close her foster care license voluntarily, or to have Catherine formally deny the license.  She gave Melinda until April 30 to decide.

On April 23, 2024, Melinda requested clarification regarding the impact of voluntarily withdrawing the license.  On

April 25, 2024, Catherine responded and informed Melinda that if she and Casey voluntarily withdrew their license, DCF might still rely on them for temporary emergency placements.  By contrast, formal revocation would prohibit Melinda and Casey from participating in the foster care program even for temporary placements.  On April 30, 2024, Melinda emailed Catherine and informed her that she and Casey were not willing to voluntarily close their license, and that if DCF wished to revoke the license it would need to send them a formal notification.

On May 29, 2024, Melinda and Casey, through counsel, sent DCF a letter explaining their objections to DCF's policies and requesting clarification regarding the status of their license. On June 14, 2024, DCF responded to the letter but reportedly failed to address the merits of Melinda's and Casey's concerns.

On or about July 6, 2024, Melinda and Casey received a formal Notice of Decision ("Notice") signed by Catherine, Defendant Stacey Edmunds, and Amy Mitchell, stating that DCF's Residential Licensing and Special Investigations ("RLSI") unit was recommending their foster-care license be revoked.  The Notice stated that the recommendation was based on Melinda's and Casey's alleged failure to comply with DCF's non-discrimination requirement (Rule 200) by failing to, among other things, commit

to facilitating the social and medical transition of a
hypothetical foster child.[1]

The Notice cited DCF's Policy 76, which states in part that
"[e]xploring one's social orientation, gender identity, and
gender expression (SOGIE) is a normal part of human identity
development." ECF No. 1-20 at 4. Policy 76 also states that
"[i]t is expected that children's identities may evolve and
change over time. All children and youth explore their
identities and express their sexuality and gender differently.
Young people may change the way they identify over time." *Id.*
The Notice explained that "LGBTQ+ youth who are not fully
embraced often experience severe psychological harm, and
caregiver rejection of identity causes additional psychological
and emotional harm." *Id.* The Notice also explained that while
some foster placements are made on an emergency basis where DCF
does not know the gender identity of the youth being placed,
"even if a cis gender child is placed with Melinda and Casey,
the child's gender may change during that placement." *Id.*

The recommendation for license revocation was based upon
Melinda's alleged "inability to foster a transgender child, to

---

[1]  The letter also stated that Melinda and Casey were unwilling
to foster a transgender-identifying child. Plaintiffs contend
that this was incorrect, as they were willing to foster a
transgender-identifying child but were not willing to commit to
facilitating the social and medical transition of a child in
their care. ECF No. 1 at 17 n.5.

talk about they/them pronouns with her five-year-old son, and to support medical interventions for transgender youth under any circumstances." *Id.* The Notice also found that "Melinda plainly stated her intention to exclude transgender foster youth from her home," thus violating DCF's rule against discrimination. *Id.*

Plaintiffs had until August 1, 2024 to file an appeal. If no appeal was filed, the revocation of their license would be effective as of that date. The Verified Complaint, filed prior to the appeal deadline, states that Plaintiffs planned to file an appeal.[2]

The Verified Complaint alleges that through its interpretation of the governing statutory and regulatory provisions, DCF "has adopted a *de facto* policy" requiring foster families to commit to facilitating the social and medical transition of transgender-identifying children in their care prior to being granted a license. ECF No. 1 at 12, ¶ 67. "Under this *de facto* policy, if a foster family already has a license, the family must provide [DCF] assurances on demand that they will commit to fostering transgender identifying children

_____

[2] Defendants initially argued that the Court should abstain from hearing this case because Plaintiffs had administratively appealed their license revocation. Plaintiffs have since withdrawn that appeal, thus rendering the decision final. Defendants now concede that abstention is no longer a viable argument for dismissal.

and facilitating the social and medical transition of a
transgender-identifying child in their care if the child
requests it." *Id.*, ¶ 68.

Plaintiffs submit that both Melinda's Facebook post and
their objection to DCF's actions are rooted in their religious
beliefs. "Plaintiffs believe that God creates humans to be
either male or female and, accordingly, that it is immoral for
adults to facilitate a minor's social or medical transition to
live as a member of a sex different from their sex at birth."
*Id.*, at 21-22, ¶ 148.

Plaintiffs filed their Complaint on July 17, 2024. The
Verified Complaint alleges that Defendant Christopher Winters,
Commissioner of DCF, is ultimately responsible for the adoption
and implementation of all DCF policies, including but not
limited to policies that govern the foster-care program, and for
all licensing decisions. Defendant Aryka Radke, Deputy
Commissioner of DCF and head of the Family Services Division,
allegedly oversees implementation of DCF's foster-care program,
including licensing decisions. Defendant Stacey Edmunds,
Director of the RLSI unit, allegedly oversees implementation of
DCF's foster care licensing decisions. Licensing Officer
Catherine processes licensing applications and allegedly
approves or denies those applications pursuant to DCF policies.

The Verified Complaint asserts four causes of action: Count I for retaliation; Count II for compelled speech and viewpoint discrimination; Count III for violation of Plaintiffs' free exercise rights; and Count IV for violation of Plaintiffs' equal protection rights.  For relief, Plaintiffs seek a declaration that Defendants' policies are unlawful on their face and as applied; preliminary and permanent injunctive relief; nominal damages; and attorney's fees and costs.

Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that they are immune from claims for damages brought against them in their official capacities.  Defendants further argue that the Verified Complaint fails to allege sufficient personal involvement by any of the named Defendants with the exception of Licensing Officer Catherine, that all Defendants are entitled to qualified immunity, and that Plaintiffs have failed to state a plausible retaliation claim.

## Discussion

### I.  Motion to Dismiss Standard

On a motion to dismiss filed under Rule 12(b)(6), a court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008).  To survive dismissal, a complaint must allege sufficient facts

to state a plausible claim. *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plaintiff's claim must be more than merely "speculative," *Twombly*, 550 U.S. at 545, and a reviewing court must "draw on its judicial experience and common sense" to determine plausibility, *Iqbal*, 556 U.S. at 679 (citation omitted).

## I.    Official Capacity Immunity

Defendants move to dismiss any claims for damages brought against them in their official capacities. Plaintiffs state in their opposition memorandum that they are pursuing only nominal damages against Defendants in their personal capacities. The Verified Complaint does not specify in what capacity Defendants would be subject to an award of damages. Because the Eleventh Amendment protects Defendants from damages awarded against them in their official capacities, *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985), and given Plaintiffs' lack of opposition on the issue, the motion to dismiss is granted to the extent the Verified Complaint may be read as seeking such damages.

## II.    Personal Involvement

Defendants next argue that Plaintiffs have failed to allege the requisite personal involvement with respect to Commissioner Winters, Deputy Commissioner Radke, and Director Edmunds.

11

Plaintiffs claim that Director Edmunds oversees licensing decisions and signed the July 1, 2024 letter informing Melinda and Casey that their license would be revoked. As discussed previously, Commissioner Winters is responsible for the adoption and implementation of DCF policies, as well as licensing decisions made within DCF. Deputy Commissioner Radke oversees implementation of the foster care program, including licensing decisions. Defendants do not argue lack of personal involvement by Licensing Officer Catherine.[3]

Plaintiffs bring their claims of constitutional violations under 42 U.S.C. § 1983. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because [that defendant] held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations

---

[3] Plaintiffs correctly note that Defendants' personal involvement argument does not pertain to claims for declaratory and injunctive relief. *See McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (explaining that a defendant's personal involvement in an alleged constitutional deprivation brought under Section 1983 is a prerequisite only to an award of monetary damages).

is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quotations and citations omitted).

In *Tangreti v. Bachmann*, the Second Circuit explained that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d 609, 618 (2d Cir. 2020) (quotation and citation omitted). "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," while in all cases "[t]he violation must be established against the supervisory official directly." *Id.* (first alteration in original) (quotations and citations omitted).

Plaintiffs claim that Defendants violated their rights through a *de facto* policy that denies licenses to families who fail to commit in advance to support the transitioning of a transgender child. By alleging a *de facto* policy, they are not challenging a specific written policy or procedure. Consequently, the allegation that certain supervisory defendants played a role in promulgating formal policies, and are thus responsible for the implementation of those policies, is insufficient to state a claim for supervisor liability. *Id.*

Plaintiffs do not specifically allege that Commissioner Winters played a role in either developing or enforcing the *de facto* policy of which they complain.  The Verified Complaint states that he is "ultimately responsible" for the adoption and implementation of DCF policies, as well as for licensing decisions.  Plaintiffs also claim that they sent Commissioner Winters a letter explaining their objections and requesting clarification.  Winters did not draft, and was not copied on, the State's response to that letter.  ECF No. 1-19 at 2-3. "Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim" against the letter's recipient. *Candelaria v. Higley*, No. 04-CV-277, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (citing cases); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (prison official who received letter from inmate and forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right).  Plaintiffs have therefore failed to sufficiently plead that Winters, through his own actions, violated their constitutional rights.

The Court similarly finds that the allegations against Deputy Commissioner Radke lack sufficient personal involvement. Radke is mentioned only twice in the Verified Complaint: once in the caption and once in the paragraph describing her

14

professional position.  That position allegedly involved
oversight of the foster care program, including licensing
decisions.

Although much of the Verified Complaint asserts allegations
against "Defendants" generally, pleadings that rely on "group
pleading" and "fail to differentiate as to which defendant was
involved in the alleged unlawful conduct are insufficient to
state a claim."  *Adamou v. Cty. of Spotsylvania, Va.*, No. 12-cv-
7789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016)
(citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d
Cir. 2001) (noting that Federal Rule of Civil Procedure 8
"requires, at a minimum, that a complaint give each defendant
fair notice of what the plaintiff's claim is and the ground upon
which it rests," and that a complaint fails to meet that minimum
requirement where it "lump[s] all the defendants together in
each claim and provide[s] no factual basis to distinguish their
conduct")).  Here, the minimal references to Deputy Commissioner
Radke, together with non-specific references to "Defendants,"
fail to allege the level of personal involvement necessary for
an award of monetary damages under 42 U.S.C. § 1983.

The Court reaches a different conclusion with respect to
Director Edmunds.  Edmunds, in addition to holding a supervisory
role, co-authored the letter notifying Plaintiffs of the
recommendation to revoke their license.  Consequently, and

unlike the allegations brought against Defendants Winters and
Radke, the Verified Complaint asserts that Edmunds played a
direct role in enforcing the *de facto* rule at the center of
Plaintiffs' license revocation.  Accordingly, only the claims
for monetary relief brought against Defendants Winters and Radke
are dismissed for lack of personal involvement.

The Court acknowledges that, in the course of discovery,
Plaintiffs may uncover facts to demonstrate that Defendants
Winters and Radke espoused, promoted, or were otherwise involved
in enforcing the *de facto* policy alleged in the Verified
Complaint.  The Court therefore dismisses those Defendants,
insofar as they are being sued in their individual capacities,
without prejudice such that Plaintiffs may move for leave to
amend their allegations in the future.

## III. Qualified Immunity

Defendants next argue for the application of qualified
immunity.  Qualified immunity "protects government officials
'from liability for civil damages insofar as their conduct does
not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.'"  *Pearson
v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity
"affords government officials 'breathing room' to make
reasonable — even if sometimes mistaken — decisions."  *DiStiso*

16

*v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)).

"In determining whether state actors are entitled to qualified immunity under federal law, [the Court] consider[s] two factors: (1) whether the facts presented make out a violation of a constitutional right; and (2) whether the right at issue was clearly established when it was allegedly violated." *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021) (internal quotation marks and citation omitted). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted). When reviewing the facts of the case, the Court must review the "specific context" rather than "broad general proposition[s]." *Id.* at 12.

"Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Torcivia*, 17 F.4th at 367 (internal quotation marks and citation omitted). Although that precedent need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "As the qualified immunity defense has evolved, it

17

provides ample protection to all but the plainly incompetent or
those who knowingly violate the law." *Malley v. Briggs*, 475
U.S. 335, 341 (1986).

Defendants' motion to dismiss argues that Plaintiffs'
claims fail to clear the second prong of the qualified immunity
test: whether the alleged conduct violated clearly established
law. ECF No. 25 at 11 n.7. A court may limit its review to
that second prong "in light of the circumstances in the
particular case at hand." *Pearson*, 555 U.S. at 236. Defendants
properly restrict their arguments to the claims for nominal
damages brought against them in their individual capacities.
*See Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013) (noting
that qualified immunity "does not protect a public official
against a claim for declaratory or injunctive relief").

Plaintiffs argue that clearly established principles
protect the rights they invoke: that the government may not
treat religious conduct less favorably than secular conduct;
that compelling speech under the guise of non-discrimination is
unlawful; that the government may not make a license contingent
on viewpoint conformity; that retaliating against citizens for
exercising First Amendment rights is unconstitutional; and that
Defendants violated principles of equal protection. ECF No. 37
at 9. As the Supreme Court explained in *Mullenix*, however,
these sorts of "broad general propositions" do not guide the

18

analysis.  577 U.S at 12.  Instead, the Court must review
Plaintiffs' claims in their specific contexts to determine
whether the alleged constitutional violations were clearly
established.  *See id.*; *White v. Pauly*, 580 U.S. 73, 79 (2017)
("clearly established law" should not be assessed "at a high
level of generality").

With respect to Plaintiffs' claims that their rights to
free speech and free expression have been violated, they cite no
Supreme Court or Second Circuit precedent clearly establishing
that Defendants' conduct was unlawful.  At most, this case
raises questions of constitutional law that are currently being
litigated, with varying results, in courts across the country.
*Compare Bates v. Pakseresht*, No. 2:23-cv-474-AN, 2023 WL 7546002
(D. Or. Nov. 14, 2023) *with Blais v. Hunter*, 493 F. Supp. 3d 984
(E.D. Wash. 2020).

Plaintiffs ask the Court to apply the Supreme Court's
holding in *Fulton v. City of Philadelphia*, in which an
independent foster care agency refused to certify same-sex
couples as foster parents because doing so conflicted with the
agency's religious principles.  593 U.S. 522, 531 (2021).  The
Supreme Court held in the agency's favor, concluding in part
that the city's contract prohibiting discrimination on the basis
of sexual orientation allowed for exceptions, was not generally
applicable, and failed to pass constitutional scrutiny.  *Id.* at

535.  Here, there is no exception to DCF's rule against discrimination.  Accordingly, *Fulton* does not control this case.

Indeed, when Plaintiffs stated that they would not be able to be affirming and supporting of a child's transition because of their religious beliefs, and could not help carry out a medical decision made by DCF, Defendants felt compelled to revoke their license.  The *Fulton* decision, in which exemptions might allow for the exercise of discretion in approving an agency, did not clearly establish that Defendants' revocation decision violated Plaintiffs' free exercise rights.  *See Bates*, 2023 WL 7546002, at *12 ("The analysis in *Fulton* is simply not applicable in this case and does not demonstrate that the government has burdened plaintiff's religious exercise in the way that the city burdened the agency's religious exercise in *Fulton*.").

Plaintiffs argue that the relevant exception lies in DCF's Licensing Rules allowing foster families to deny a placement for reasons such as inadequate space or insufficient financial capacity, but not for religious reasons.  That argument ignores the reasoning of Policy 76, which is designed in part to select families who will be supportive as a child grows into, and perhaps shifts, their sexual identity.  ECF No. 1-7.  While space or financial considerations can be anticipated, the same

is not always true with respect to the sexual identity of a
young person.

Plaintiffs also argue that Defendants violated their free
speech rights.  In support of their claim of compelled speech,
Plaintiffs cite *303 Creative LLC v. Elenis*, in which the Supreme
Court held that held that Colorado's public accommodation law
forbidding businesses from engaging in discrimination violated
the plaintiff's right to free speech.  600 U.S. 570, 588 (2023).
More specifically, the Supreme Court determined that Colorado
could not require a website and graphic design company to create
wedding websites for gay couples under the State's anti-
discrimination law.  *Id.*

Defendants argue that *303 Creative* applied to pure
expressive speech, and that this case is distinguishable because
it involves the regulation of conduct, rather than speech, by
foster parents.  The Court agrees, as the centerpiece of this
litigation is Plaintiffs' inability to abide by DCF policies.
Moreover, "*303 Creative* was not connected to a population that
the state had a duty to protect." *Bates*, 2023 WL 7546002, at
*17.  Ultimately, it was not clearly established that
Defendants' conduct, which was based upon the state's interest
in protecting transitioning youth, fails to survive
constitutional scrutiny even after the *303 Creative* decision.
*See id.* at *28-*29 (denying preliminary injunctive relief where

21

"the government has asserted compelling interests in protecting the LGBTQ+ youth in its care" and plaintiff "provided no plausible alternatives that would further the government's interests with the same effectiveness" as a rule barring discrimination).

Plaintiffs also rely on *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 763 (2018) ("*NIFLA*"), in which the Supreme Court considered a challenge to a state law requiring pro-life crisis pregnancy centers to post notice of California's public family-planning services. The facts in *NIFLA* are far afield from those presented here. Plaintiffs seek to draw a parallel with *NIFLA* by citing the Supreme Court's finding that California failed to establish more than a "hypothetical" justification for notifying the public that facility personnel were unlicensed. *Id.* at 776. Here, Defendants' justification for its gender-affirming policies is not hypothetical, as there can be no dispute that there will continue to be children in DCF care who identify as LGBTQ, including transgender youth. DCF does not always know which children will require gender-affirming care and must therefore screen all applicant foster families as to their ability to support children who require such care. Defendants' reliance on *NIFLA* is therefore misplaced.

22

Plaintiffs next argue that the prohibition on viewpoint discrimination is well established, and that the government may not make a license contingent on viewpoint compliance. Plaintiffs cite *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018), in which the Second Circuit held the government had engaged in unlawful viewpoint discrimination by denying an application for a food truck branded with ethnic slurs. *Destito* dealt very specifically with regulations of potentially-offensive speech, discussing at length the Supreme Court's guidance on that issue. 879 F.3d at 31-33 (citing *Matal v. Tam*, 582 U.S. 218 (2017)). Nothing in the cases cited by Plaintiffs would have put Defendants on notice that the facts of this case constituted clearly established viewpoint discrimination.

Because Defendants do not offer specific arguments for the application of qualified immunity to Plaintiffs' retaliation or equal protection claims,[4] the Court will not grant them relief on those causes of action at this time. *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Qualified immunity

---

[4] Defendants argue generally in their initial memorandum that they are entitled to qualified immunity on Plaintiffs' First and Fourteenth Amendment claims. ECF No 25 at 12. In opposition, Plaintiffs argue against qualified immunity by citing specific case law in support of each of their claims, including their equal protection and retaliation claims. ECF No. 37 at 24. Defendants' reply memorandum addresses only Plaintiffs' First Amendment cases. ECF No. 39 at 7-10. The Court therefore declines to award qualified immunity on Counts I (retaliation) and IV (equal protection) of the Verified Complaint.

is an affirmative defense on which the defendant has the burden
of proof.").  The motion to dismiss on the basis of qualified
immunity is therefore granted in part and denied in part.

## IV.  Retaliation

Defendants' final argument for dismissal is that Plaintiffs
fail to allege a plausible retaliation claim.  Defendants
contend that Plaintiffs have failed to allege a causal
connection between Melinda's protected speech on Facebook and
the license revocation.  Plaintiffs counter that Melinda's
Facebook post was the catalyst for DCF's inquiries into
Plaintiffs' view of gender-affirming care, and that Melinda's
statements during that inquiry resulted in the license
revocation.

"To establish First Amendment retaliation by a government
actor, the plaintiff must demonstrate that '(1) his or her
speech or conduct was protected by the First Amendment; (2) the
defendant took an adverse action against him or her; and (3)
there was a causal connection between this adverse action and
the protected speech.'"  *Agosto v. New York City Dep't of Educ.*,
982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of
Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018)).  Defendants do not
dispute that Melinda's speech on Facebook was protected by the
First Amendment.  Nor is there any dispute that Defendants took

an adverse action in the form of the license revocation.  The motion to dismiss therefore focuses on causal connection.

The Verified Complaint alleges that Melinda made her Facebook post in February 2024.  Licensing Officer Catherine contacted Melinda on April 1, 2024, shared that she had been made aware of the post, and spoke to Melinda about Plaintiffs' willingness to support social and medical transitioning for a transgender child.  On April 4, 2024, DCF informed Plaintiffs that they would not be able to continue fostering, and on July 1, 2024 revoked their license.  Given this series of events, Plaintiffs argue that they have met their initial burden of showing that the Facebook post was a "substantial or motivating factor" in Defendants' decision to make inquiries and, ultimately, take retaliatory action.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ("*Mount Healthy*"); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

Defendants contend that the Verified Complaint fails to state a retaliation claim because it alleges a legal, non-retaliatory basis for the license revocation.  Specifically, Defendants submit that rather than attributing retaliation to the Facebook post, the Verified Complaint alleges that the motivating factor behind the license revocation was Plaintiffs' alleged unwillingness to adequately support a transgender child.

25

The Supreme Court has held that if a plaintiff carries its
initial burden of showing retaliation, a court should consider
whether that defendant has "shown by a preponderance of the
evidence that it would have reached the same decision . . . even
in the absence of the protected conduct." *Mt. Healthy*, 429 U.S.
at 287.  That showing typically occurs at either summary
judgment or trial. *See Johnson v. Eggersdorf*, 8 F. App'x 140,
144 (2d Cir. 2001) ("*Mt. Healthy* sets forth the appropriate
standard for a § 1983 claim at trial, not for a motion to
dismiss based on the pleadings."); *Anemone v. Metro. Transp.
Auth.*, 410 F. Supp. 2d 255, 267 (S.D.N.Y. 2006) (noting that
consideration of *Mt. Healthy* defense "is premature on
defendant's motion to dismiss").  Indeed, "[o]n a motion to
dismiss, a reasonable inference of a causal connection is all
that is required." *Gonzalez v. City of New York*, 377 F. Supp.
3d 273, 295 (S.D.N.Y. 2019) (citing *Posr v. Court Officer Shield
# 207*, 180 F.3d 409, 418 (2d Cir. 1999)).

Plaintiffs argue that both the Facebook post and Melinda's
subsequent discussions led to the license revocation.  At this
early stage in the case, and making all reasonable inferences in
Plaintiffs' favor, the Court declines to determine which
portions of Melinda's protected speech may have given rise to
Defendants' actions.  Defendants' motion to dismiss the

retaliation claim is denied, though the issue may be revisited later in the case.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part.  Plaintiffs may proceed on their claims for declaratory and injunctive relief. Plaintiffs may also proceed on their claims for nominal damages against Defendants Edmunds and Catherine in their individual capacities, but only as to Counts I and IV of the Verified Complaint.

DATED at Burlington, in the District of Vermont, this 19th day of February 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court Judge