```
                  UNITED STATES DISTRICT COURT
                            FOR THE
                     DISTRICT OF VERMONT


MELINDA ANTONUCCI, CASEY        )
MATHIEU,                        )
                                )
        Plaintiffs,             )
                                )
        v.                      )        Case No. 2:24-cv-783
                                )
CHRISTOPHER WINTERS, in his     )
personal and official           )
capacity as Commissioner of     )
the Vermont Department for      )
Children and Families; ARYKA    )
RADKE, in her personal and      )
official capacity as Deputy     )
Commissioner, Vermont           )
Department for Children and     )
Families, Family Services       )
Division; STACEY EDMUNDS,       )
in her personal and official    )
capacity as Director,           )
Residential Licensing &         )
Special Investigations,         )
Vermont Department for          )
Children and Families; and      )
PAULA CATHERINE, in her         )
personal and official           )
capacity as a Licensing         )
Officer, Residential            )
Licensing & Special             )
Investigations, Vermont         )
Department for Children         )
and Families,                   )
                                )
        Defendants.             )
```

## OPINION AND ORDER

Plaintiffs Melinda Antonucci and Casey Mathieu bring this

action claiming violations of their rights under the First and

Fourteenth Amendments to the United States Constitution.

Plaintiffs allege Defendants unlawfully revoked their license to serve as foster parents after they expressed certain objections, including their unwillingness to assist with the social and medical transitioning of a potential transgender foster child. Now before the Court is Plaintiffs' motion for a preliminary injunction, which seeks to enjoin Defendants from revoking their foster care license while this litigation is pending.  For the reasons set forth below, the motion is denied.

<u>**Factual Background**</u>

## I.   Responsibility for Foster Children's Care

The Vermont Department for Children and Families ("DCF") administers the State's foster care program according to its Licensing Rules for Foster Homes in Vermont ("Rules").  ECF No. 1-8.  While a child is in foster care, DCF retains legal custody over that child.  Consequently, DCF retains decision-making authority regarding the child's care.

By statute, each child in DCF custody has a case plan that includes information about the child's "medical, psychological, social, educational, and vocational needs" as well as a "plan of services."  33 V.S.A. § 5316(b).  Foster parents must demonstrate to DCF that they are able to "meet the physical, emotional, developmental and educational needs of each foster child in accordance with the child's case plan."  Rule 301.  DCF Policy dictates that foster parents do not have the right to

2

control a foster child's medical treatment. *See* Policy 77 ("Once a child or youth is in the custody of [DCF], the Family Services Division has the responsibility to ensure that appropriate medical and dental services are provided."); *see also* Rule 329 (requiring foster parents to "cooperate with the custodian in securing routine and emergency medical and mental health care for foster children").

## II.  LGBTQ Protections in the Foster Care Program

DCF Rules and Policies provide certain protections for LGBTQ children within the foster care system.  For background on the development of those protections, Defendants have submitted the declaration of Lindsay Barron, Policy and Planning Manager in DCF's Family Services Division ("FSD").  ECF No. 31.  Prior to becoming Policy and Planning Manager, Barron served as an FSD Planning and Policy Advisor.  In that prior role, she participated in the policy-development process at FSD.

Barron explains that in mid-2015, DCF realized that the foster care system's treatment of LGBTQ youth required a significant review.  Certain community partners were reporting youth concerns about the lack of attention to their needs, and DCF was receiving an increasing number of questions about how to deal with issues such as exploration of sexual orientation, gender identity, and gender expression.  DCF did not have a

policy in place at that time regarding the treatment of LGBTQ foster children.

Barron further explains that research had begun to show that LGBTQ children were overrepresented in foster care systems and were experiencing poor outcomes. Data compiled by the Vermont Department of Health showed a substantially increased risk of negative outcomes among LGBTQ youth, including depression, suicidality, sexual assault, missing school, and substance abuse. Vermont's findings were consistent with other studies, which showed that challenges facing LGBTQ children were particularly serious in the foster care system.

In response to these concerns, DCF convened a multi-disciplinary LGBTQ Workgroup in early 2016. In September 2016, the group released a report summarizing feedback from focus groups involving children in DCF custody. The feedback showed that LGBTQ children in the foster care system felt unsafe identifying themselves as LGBTQ, unsupported, and misunderstood by various actors in the system.

In early 2017, DCF created a new policy, Policy 76, intended to improve outcomes by providing "safe, healthy, and inclusive environment[s] for all children and youth served by the division." ECF No. 31-4 at 1. Policy 76 specifically acknowledges that exploring sexual orientation, gender identity, and gender expression "is a normal part of human identity

4

development," and that DCF will prohibit "discrimination and bias based on a child or youth's real or perceived sexual orientation, gender identity, or gender expression." *Id.* Policy 76 requires staff to consider a potential caregiver's "attitude and behavior" about children's sexual or gender identity, and to make "ongoing efforts to recruit, train, support, and retain resource families who are LGBTQ affirming and supporting." *Id.* at 5.

Later in 2017, DCF amended Policy 76 to add guidance regarding "additional supports and resources" for families "to work through barriers they may face regarding their child's gender or sexual identity." ECF No. 31-6 at 4. In 2018, DCF received a "Youth Advocacy Document" from Forward Youth Advisory Board, a group of young people ages 14 to 22 who each had experience in Vermont's foster care system. ECF No. 31-7. The Youth Advocacy Document expressed the need for foster homes where children are safe, comfortable, and treated with dignity, and specifically recommended that DCF require all foster parents to take the LGBTQ training offered by the department.

In November 2022, DCF updated and clarified its Foster Care Licensing Rules with respect to LGBTQ youth. DCF added language to Rule 200, the department's anti-discrimination rule, expressly prohibiting a foster parent from discriminating against a foster child based on sexual orientation and gender

5

identity.  Rule 201.10 requires "[r]espect for the worth of all
individuals regardless of race, color, national origin,
ancestry, culture, religion, sex, gender identity, sexual
identity, and physical or mental ability."  Rule 315 requires
foster parents to support children in wearing hairstyles,
clothing, and accessories affirming the child's racial,
cultural, tribal, religious, or gender identity.  DCF further
amended Rule 035, adding a provision that prohibits the
department from granting variances from Rules 200, 201, and 315.

**III. The Licensing Process**

When considering prospective foster parents for licensing,
members of DCF's Residential Licensing Special Investigation
("RLSI") unit conduct a background check, interviews, and home
site visits.  Pursuant to Policy 76, RLSI workers include in
their review the ability of potential foster parents to keep
"children and youth safe while meeting their unique needs,
regardless of whether those needs are related to their sexual
orientation, gender identity, or gender expression."  ECF No.
31-6 at 1.  The foster care license application also asks self-
assessment questions, in which applicants are asked to rate on a
scale of 1 to 5 their agreement with various statements,
including: "My family would be accepting and supportive of an
LGBTQ foster child."  ECF No. 30-1 at 9.

In addition to the Barron Declaration, Defendants have submitted a declaration from RLSI Director Stacy Edmunds, a Defendant in this case.  ECF No. 30.  Edmunds explains that applicants who rate themselves at the low end of the scale often do so because they do not know what it means to be affirming and supportive, or because they do not know much about LGBTQ youth. RLSI works to help those applicants better understand the requirements and what it would mean to be supportive, and many such applicants are ultimately licensed.

Edmunds asserts that the reasons for an applicant's possible discomfort with LGBTQ children are not considered by RLSI.  Consequently, the applicant's religion is not a consideration.  The focus is instead on the well-being of the child.  According to Edmunds, multiple families have expressed concerns based upon their religious beliefs, and after learning more about LGBTQ youth and what was required, "reached the point where they could commit to being supportive and affirming of an individual child in their care, notwithstanding broader beliefs about sexual orientation and gender identity."  ECF No. 30 at 4, ¶ 14.

Because foster parents may not discriminate, they must be willing to accept any child.  Rule 200.1 does provide an exception for parents who are unable to foster children of a particular age or with special needs.  Barron explains that Rule

7

200.1 reflects certain practical realities, as with a family living in a one-bedroom home.  DCF Rules state that a child over the age of two may not sleep in the same room as an adult, so such a family could not provide a home for a child older than two.  A family's resources will also be considered when placing a child with a disability, as the child might require special equipment, specialized training, a higher than usual time commitment, and schedule flexibility to meet with treatment teams and other providers.  DCF does not consider such concerns "discrimination" on the basis of either age or disability under Rule 200.1.  ECF No. 31 at 10-11.

Defendants' memorandum in opposition to the motion for a preliminary injunction cites research supporting the importance of family acceptance for LGBTQ youth.  Such studies reportedly show that "highly rejected" LGBTQ youth are far more likely to suffer from high levels of depression, attempt suicide, use drugs, and be at risk for sexually transmitted diseases. Support by caregivers includes being welcoming to LGBTQ friends or partners, talking respectfully about the individual's LGBTQ identity, using names and pronouns correctly, supporting gender expression, and educating themselves about LGBTQ people and issues.  Family support is associated with improved outcomes including greater self-esteem, better health, less depression, less substance abuse, and fewer suicide attempts.

## IV.  Gender-Affirming Care

Gender-affirming care is a central element of this case.
Gender-affirming care may include medical interventions that
align a person's physiology with their gender identity.
Plaintiffs describe such care as controversial, and it is
undisputed that some states have banned gender-affirming care
for minors.  Defendants submit that much of the medical
community, including the American Academy of Pediatrics,
supports the practice.

Defendants note that gender-affirming care is a medical
treatment, and that DCF retains the legal responsibility,
sometimes together with the child's parents, for decision-making
regarding a child's significant medical treatments.  The role of
the foster parent is to facilitate the medical treatment plan
by, for example, taking the child to appointments.  Within
Vermont's foster care system, medical recommendations for
gender-affirming care are treated the same as any other medical
issue.

## V.  Plaintiffs' Allegations

The Verified Complaint alleges that Plaintiffs Melinda
Antonucci and her husband Casey Mathieu, parents of three
children, are active in their Christian church and local
community.  In or about 2023, Plaintiffs applied for a foster
care license.  On the license application, they indicated they

would be willing to foster an "LGBTQ+" child and rated
themselves a 3 out of 5 with respect to their level of agreement
with the statement: "My family would be accepting and supportive
of an LGBTQ foster child."  During the first required home
inspection, Melinda informed a DCF employee that she and her
husband had some hesitation about fostering a transgender-
identifying child, but did not go into specifics.  The DCF
employee allegedly advised Plaintiffs to avoid expressing their
hesitation during the next home inspection, opining that DCF
might not issue them a license.

On October 19, 2023, DCF employee Paula Catherine, one of
the Defendants in this case, contacted Plaintiffs by email to
schedule the second required home inspection.  In that email,
Catherine asked Melinda and Casey to complete a supplemental
training module.  The module reportedly covered affirming a
foster child's transgender identity and facilitating the
provision of medical and psychological treatment to aid in the
child's transition if the child requested it.  Catherine
indicated that this supplemental training was necessary given
DCF's perception that Plaintiffs were hesitant to foster a
transgender-identifying child.

When Catherine arrived at Plaintiffs' home later that day,
she reportedly stressed that all homes must be "affirming" of a
child's transgender identity.  Melinda expressed reservations

about facilitating psychological and medical treatment for a
transgender-identifying child if requested.  Because Melinda and
Casey were looking to foster a younger child close to their
five-year-old son's age, they informed Catherine that they did
not think the issue of a transgender-identifying child would
arise.

In January 2024, DCF approved Plaintiffs' foster care
application and issued them a license.  The following month,
Melinda and Casey began fostering an eight-year-old boy.  The
placement was on an emergency basis and lasted for approximately
two weeks.

In February 2024, Melinda posted on her personal Facebook
account her support for a petition calling on the local school
district to inform a child's parents prior to assisting that
child's social transition to a new gender identity at school.
Caseworkers with DCF became aware of the post and opened an
investigation.  On April 1, 2024, Catherine emailed Melinda
requesting to speak to her about the petition.  In a phone call
later that day, Catherine asked Melinda about her beliefs on
transgender-identifying children, including her willingness to
use preferred names.  Melinda allegedly explained that while she
was not opposed to fostering a transgender-identifying child,
she said she would not facilitate a child's medical transition

or require her five-year-old son to use the hypothetical foster child's preferred names and pronouns.

The Verified Complaint alleges that, because DCF generally allows parents to consider a specific child before agreeing to foster, Melinda did not think her position would present a problem since she and Casey could choose not to foster a transgender-identifying child. The Verified Complaint notes that DCF allows potential foster families to "say no" to a placement, stating in the DCF Foster Parent Guide that "[t]he ability to say no [to a placement] is one of the most important skills you can have as a foster parent." ECF No. 1-6 at 8.

On April 4, 2024, Catherine emailed Melinda and informed her that "since [Melinda] will not foster a transgender child and discuss they/them pronouns with [the] child, then [DCF does not] know how [it] can move forward with fostering given the inability to predict any foster child's journey with their own identity." ECF No. 1 at 16. Catherine gave Melinda the option to either close her foster care license voluntarily, or to have Catherine formally deny the license. She gave Melinda until April 30 to decide.

On April 23, 2024, Melinda requested clarification regarding the impact of voluntarily withdrawing the license. On April 25, 2024, Catherine responded and informed Melinda that if she and Casey voluntarily withdrew their license, DCF might

still rely on them for temporary emergency placements. By
contrast, formal revocation would prohibit Melinda and Casey
from participating in the foster-care program even for temporary
placements. On April 30, 2024, Melinda emailed Catherine and
informed her that she and Casey were not willing to voluntarily
close their license, and that if DCF wished to revoke the
license it would need to send them a formal notification.

On May 29, 2024, Melinda and Casey, through counsel, sent
DCF a letter explaining their objections to DCF's policies and
requesting clarification regarding the status of their license.
On June 14, 2024, DCF responded to the letter but reportedly
failed to address the merits of Melinda's and Casey's concerns.

On or about July 6, 2024, Melinda and Casey received a
formal Notice of Decision ("Notice") signed by Catherine, Stacey
Edmunds, and Amy Mitchell, stating that DCF's RLSI unit was
recommending their foster-care license be revoked. ECF No. 1-
20. The Notice stated that the recommendation was based on
Melinda's and Casey's alleged inability to comply with DCF's
non-discrimination requirement (Rule 200) by failing to, among
other things, commit to facilitating the social and medical
transition of a hypothetical foster child.[1]

---

[1]    The letter also stated that Melinda and Casey were unwilling
to foster a transgender-identifying child. Plaintiffs contend
that this was incorrect, as they were willing to foster a
transgender-identifying child but were not willing to commit to

The Notice cited DCF's Policy 76 which, as discussed above, states in part that "exploring one's social orientation, gender identity, and gender expression (SOGIE) is a normal part of human identity development." *Id.* at 4. Policy 76 also states that "[i]t is expected that children's identities may evolve and change over time. All children and youth explore their identities and express their sexuality and gender differently. Young people may change the way they identify over time." *Id.* The Notice explained that "LGBTQ+ youth who are not fully embraced often experience severe psychological harm, and caregiver rejection of identity causes additional psychological and emotional harm." *Id.* The Notice also explained that while some foster placements are made on an emergency basis where DCF does not know the gender identity of the youth being placed, "even if a cis gender child is placed with Melinda and Casey, the child's gender may change during that placement." *Id.*

The recommendation for license revocation was based upon Melinda's alleged "inability to foster a transgender child, to talk about they/them pronouns with her five-year-old son, and to support medical interventions for transgender youth under any circumstances." *Id.* The Notice also found that "Melinda plainly stated her intention to exclude transgender foster youth

---

facilitating the social and medical transition of a child in their care. ECF No. 1 at 17 n.5.

from her home," which would violate DCF's rule against
discrimination.  *Id.*

Plaintiffs had until August 1, 2024 to file an appeal.  If
no appeal was filed, the revocation of their license would be
effective as of that date.  The Verified Complaint, filed prior
to the appeal deadline, states that Plaintiffs planned to file
an appeal.  Plaintiffs have since withdrawn their appeal, thus
rendering the revocation decision final.

The Verified Complaint alleges that through its
interpretation of the governing statutory and regulatory
provisions, DCF "has adopted a *de facto* policy" requiring foster
families to commit to facilitating the social and medical
transition of transgender-identifying children in their care
prior to being granted a license.  ECF No. 1 at 12, ¶ 67.
"Under this *de facto* policy, if a foster family already has a
license, the family must provide [DCF] assurances on demand that
they will commit to fostering transgender-identifying children
and facilitating the social and medical transition of a
transgender-identifying child in their care if the child
requests it."  *Id.*, ¶ 68.

Plaintiffs submit the Facebook post and their objections to
DCF's actions are all rooted in their religious beliefs.
"Plaintiffs believe that God creates humans to be either male or
female and, accordingly, that it is immoral for adults to

15

facilitate a minor's social or medical transition to live as a member of a sex different from their sex at birth." *Id.* at 21-22, ¶ 148.  They claim that Defendants violated their First Amendment speech rights, both facially and as applied, by (1) initiating an investigation, (2) recommending that their license be revoked, and (3) pursuing revocation proceedings based on their refusal to agree in advance to socially transition a transgender-identifying foster child.  These actions also allegedly violated Plaintiffs' free exercise and equal protection rights.

The Verified Complaint asserts four causes of action: Count I for retaliation; Count II for compelled speech and viewpoint discrimination; Count III for violation of Plaintiffs' free exercise rights; and Count IV for violation of Plaintiffs' equal protection rights.  The pending motion for a preliminary injunction asks for relief on the basis of the free speech and free exercise claims.  ECF No. 2-1 at 2.

## Discussion

### I.  Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  In order to justify a preliminary injunction, a movant must demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious

question going to the merits to make them a fair ground for
trial, with a balance of hardships tipping decidedly in the
plaintiff's favor; and (3) that the public's interest weighs in
favor of granting an injunction. *See Metro. Taxicab Bd. of
Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)
(citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,
20 (2008)). "When, as here, the moving party seeks a
preliminary injunction that will affect government action taken
in the public interest pursuant to a statutory or regulatory
scheme, the injunction should be granted only if the moving
party meets the more rigorous likelihood-of-success standard."
*Id.* (citation omitted); *see Friends of the E. Hampton Airport,
Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).

## II. Likelihood of Success

### A. Freedom of Speech

The parties' fundamental disagreement with respect to
Plaintiffs' freedom of speech claim is whether the DCF Rules and
Policies, as well as Defendants' actions, pertained primarily to
speech or conduct. Defendants argue conduct: that the Rules and
Policies focus strictly on actions that are in the best interest
of the foster child, such as facilitating medical care
decisions, and do not require foster parents to espouse or
endorse any form of ideology. Plaintiffs argue speech: that
Defendants compelled them to say certain things, as in

17

discussing the use of pronouns with their own children, and to declare in advance of a foster placement that they would assist with social and medical transitioning.

Plaintiffs allege both compelled speech and viewpoint discrimination. "While the First Amendment protects the rights of citizens to express their viewpoints, however unpopular, it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest in safety, and its right to regulate conduct that it legitimately considers potentially dangerous." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004). Here, those state interests encompass the health and safety of LGBTQ youth in the foster care system.

Vermont law requires DCF to "protect and promote the welfare of children." 33 V.S.A. § 4903. Accordingly, DCF's Rules require foster parents to "provide positive, constructive experiences for all children in their care." Rule 010. Policy 76 expands on these principles with respect to LGBTQ youth, while recent Rule amendments, including amendments impacting Rules 200 and 201, similarly guide the care of children in the foster care system.

These latter Rules and Policies, as discussed above, are driven by research and feedback on the factors that improve outcomes for LGBTQ youth in foster care. Those outcomes include

18

rates of depression, substance abuse, and suicide attempts.
Given those concerns, DCF is tasked with ensuring that foster
care licensees are able and willing to provide an accepting and
supportive home.  Confirming such capabilities, which might
include facilitating gender-affirming care, relates directly to
caregiver conduct.  *See, e.g., Bates v. Pakseresht*, No. 2:23-CV-
00474-AN, 2023 WL 7546002, at *16 (D. Or. Nov. 14, 2023)
(concluding that state rule regulating foster care of LGBTQ
youth "does not facially compel or restrict speech, but rather
seeks to regulate an applicant's conduct in creating a
respectful, affirming, and supportive home for a child in [the
state's] care").

Plaintiffs argue that Defendants are compelling them to
agree to comply with "the state's orthodoxy" even though it
conflicts with their religious views.  Compliance, however, is
different from speech.  Defendants did not compel Plaintiffs to
change their beliefs, or to make any statements that disavowed
those beliefs.  Instead, Defendants were pursuing their mission
of ensuring a welcoming, affirming, and safe home for each
child.

Plaintiffs further argue that in addition to compelling
agreement with gender-affirming care, Defendants were compelling
them to use preferred pronouns and to otherwise speak in ways
that are contrary to their religious beliefs about gender and

19

sexuality. Those restrictions are based upon research and feedback regarding outcomes for LGBTQ youth, are not targeted at any particular viewpoint, and are at most incidental to rules of conduct designed to promote healthy and affirming homes.[2]

Defendants' briefing notes that the DCF Rules include a host of restrictions on potentially-harmful conduct, including requiring "healthy patterns of social and interpersonal relationships" (Rule 201.1), disciplining "in a constructive and educational manner" (Rule 201.3), and respecting the foster child's religious beliefs and cultural heritage (Rule 338). If those restrictions bar caregivers from, for example, using foul or abusive language in the home, or espousing the superiority of their own religious practices, the burdens on speech are incidental to the well-being of the foster child. Such incidental burdens are not unconstitutional. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) ("The First Amendment does not prevent restrictions directed at commerce or conduct

---

[2] In *Bates*, the district court concluded that although on its face the rule at issue did not compel speech, the State's application of the Rule was compelling speech as speech rather than conduct. 2023 WL 7546002, at *17. Even if the Court were to reach that same conclusion here, the Court would still deny preliminary injunctive relief based upon its finding that the Rules and Policies in this case, both facially and as applied, satisfy strict scrutiny as discussed below.

from imposing incidental burdens on speech."); *Kerik*, 356 F.3d at 209.[3]

**B. Free Exercise**

Plaintiffs also seek preliminary injunctive relief on the basis of their free exercise claim.  The Free Exercise Clause "protects an individual's private right to religious belief, as well as the 'performance of (or abstention from) physical acts that constitute the free exercise of religion.'"  *Kane v. De Blasio*, 19 F.4th 152, 163–64 (2d Cir. 2021) (quoting *Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014)).  To succeed on a Free Exercise Clause claim, a plaintiff must generally establish that "'the object of [the challenged] law is to infringe upon or restrict practices because of their religious motivation,' or that its 'purpose . . . is the suppression of religion or religious conduct.'"  *Okwedy v. Molinary*, 69 F. App'x 482, 484 (2d Cir. 2003) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("*Lukumi*")).

---

[3]  In *Kerik*, the Second Circuit held that "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." 356 F.3d at 209.  The DCF Rules and Policies at issue are generally applicable for reasons discussed immediately below.

Free Exercise Clause protection "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Kane*, 19 F.4th at 163-64. When the government seeks to enforce a law that is neutral and of general applicability, "it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). "If the law is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." *We the Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023).

When reviewing neutrality, the Court begins its analysis with the text of the relevant Rules and Policies. "A law is not neutral ... if it is specifically directed at a religious practice." *Cent. Rabbinical Cong.*, 763 F.3d at 193; *see Lukumi*, 508 U.S. at 533 ("if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral"). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533.

Here, nothing on the face of DCF's Rules and Policies targets religious practices or religious applicants. *See Bates*, 2023 WL 7546002, at *4 (concluding that a similar policy "makes no reference to any specific religious practice, nor does it implicate religion on its face"). Even without specific references to religion, however, a facially-neutral law may be unlawful if it "targets religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534. The Court must therefore review "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.* at 539.

The history of DCF's policy development with respect to LGBTQ youth in the foster care system is set forth above. Briefly stated, DCF's response was driven by community concerns and by recent research regarding outcomes for LGBTQ children in foster care settings. DCF's Rule and Policy revisions were clearly implemented to guide caregivers, and to encourage screening practices, to help ensure safe and healthy homes for those children. Nothing in that history suggests religious targeting.

Application of DCF's Rules and Policies was similarly neutral. "Official action that targets religious conduct for

distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."  *Id.* at 534.  The Edmunds declaration states that religion is not a factor when licensing foster caregivers.  In this case, DCF appears to have focused exclusively on whether Plaintiffs would be able to provide an accepting home, including using appropriate pronouns and, if necessary, assisting with gender-affirming care.  The Verified Complaint makes clear Plaintiffs' belief that God created two genders, and that it would be immoral for them to support a transgender child's transitioning.  Because Plaintiffs would be unable to provide a supportive and affirming home in that context, they could not offer care consistent with the research-based policies developed by DCF for the protection and well-being of transgender youth. Defendants had a duty to enforce those policies, and nothing in the record suggests that they were instead acting based upon a masked hostility to a certain set of religious beliefs.

Plaintiffs argue that objections to DCF's Rules and Policies regarding the care of LGBTQ children are most likely to be founded on religious grounds.  Plaintiffs concede, however, that particularly as to gender transitioning, there are also secular objections.  Again, nothing in the record indicates that

implementation of those policies constitutes a masked or overt attempt to deny applicants on religious grounds.

The policies are also generally applicable. "The general applicability requirement prohibits the government from in a selective manner imposing burdens only on conduct motivated by religious belief." *Cent. Rabbinical Cong.*, 763 F.3d at 196 (citation and quotation marks omitted). "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (quotations marks and citations omitted). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534.

Plaintiffs contend that allowances in the DCF Rules, as in the exemptions for families unable to care for children of a certain age or for those with special needs, mean the Rules are not generally applicable. However, the "mere existence of an exemption procedure, absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny." *We The Patriots*

*USA, Inc. v. Hochul*, 17 F.4th 266, 288-89 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).

As Lindsay Barron explains in her declaration, the exemptions in question address practical concerns, primarily related to space or family resources.  Notably, shortly after DCF implemented Policy 76, it amended its Rules to offer no exemptions for discrimination.  As a result, a foster care applicant's refusal to facilitate gender-affirming medical care or use affirming pronouns has no exemption.  Because there is no exemption, the reason behind any such refusal is irrelevant, thus placing secular and religious objections on even ground.

### C. Constitutional Scrutiny

Given the Court's conclusion that the Rules and Policies at issue here, both facially and as applied, are neutral and generally applicable, Defendants need only show a rational basis for their enforcement "even if enforcement of the law incidentally burdens religious practices."  *Fifth Ave. Presbyterian Church*, 293 F.3d at 574.  In this case that review is straightforward, as Defendants have shown that Policy 76 and related changes to DCF's Rules and Policies were prompted by feedback from various stakeholders, and by recent research showing the dangers inherent in failing to adequately accept and provide for LGBTQ youth in Vermont's foster care system.

Defendants argue alternatively that, regardless of the level of scrutiny, Plaintiffs are not likely to succeed. Official action "burdening religious conduct that is not both neutral and generally applicable . . . is subject to strict scrutiny." *Cent. Rabbinical Cong.*, 763 F.3d at 193. When applying strict scrutiny, the Court considers whether Defendants' policies are "narrowly tailored" to serve a "compelling" state interest. *Lukumi*, 508 U.S. at 546.

It is well established that the government has a "compelling governmental interest in the protection of minor children." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (quotation marks and citation omitted); *see Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) (citing "the state's compelling interest in protecting children from abuse and neglect"). Creating rules and policies to protect the health and welfare of foster children therefore furthers a compelling state interest. *See New York v. Ferber*, 458 U.S. 747, 757 (1982) ("we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights").

Plaintiffs argue that, in this case, the state's interest is not compelling because there is national, and even global, disagreement about the propriety of medical transitioning.

Plaintiffs cite, for example, the Cass Review, a years-long study conducted in the United Kingdom by The National Health Service.  The study reportedly concluded there is little high-quality evidence demonstrating that gender-affirming care for minors is either effective or safe.

Evaluating the efficacy or safety of a particular procedure is not within this Court's purview.  The Court's role is to determine whether the Rules and Policies enforced here, which pertain to medical and social transitioning as well as the use of gender-appropriate pronouns, serve a compelling state interest.  At this stage in the case, Defendants have submitted sufficient evidence of the benefits of those policies to satisfy that portion of the strict scrutiny test.

Narrow tailoring requires the government to demonstrate that a policy is the "least restrictive means" of achieving its objective.  *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981).  The government's justification "must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures" imposing lesser burdens on religious liberty "would fail to achieve the government's interests, not simply that the chosen route was easier."  *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

28

2:24-cv-00783-wks    Document 50    Filed 02/20/25    Page 29 of 31


Plaintiffs argue that the policies at issue here are not narrowly-tailored because they can be applied at the placement stage, rather than the licensing stage. That solution ignores the potential for a child to be placed and, post-placement, transition to a different gender. In that event, a family that is unwilling to provide the support mandated by DCF would no longer be a suitable placement for that child. In her declaration, Barron attests that "[r]emoval of an LGBTQ foster child from their placement specifically because of their LGBTQ identity is extremely damaging to their psychological and physical safety, mental health, well-being, and normalcy." ECF No. 31 at 6, ¶ 23. Plaintiffs' citations to rules for re-placement in other situations, including those that are a "bad fit," bear little relevance to the specific concerns for LGBTQ youth at issue here. The Court therefore finds, based upon the current record, that the Rules and Policies established and implemented by DCF and Defendants serve the compelling interest of protecting the health and welfare of LGBTQ youth, and are narrowly-tailored to necessarily address that interest.

## III. Other Factors Weigh Against Granting Preliminary Relief

Plaintiffs contend that violation of their First Amendment rights, standing alone, constitutes irreparable harm. At the preliminary injunction stage, however, "[b]ecause the deprivation of First Amendment rights is an irreparable harm, in

29

First Amendment cases the likelihood of success on the merits is the dominant, if not the dispositive, factor." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quotation marks and citation omitted). As discussed above, the Court finds that Plaintiffs are not likely to succeed on the merits of their claims.

Plaintiffs' final assertion is that protecting First Amendment rights is in the public interest. The Court finds that in this case, the public interest is served by responding to the needs of young people in Vermont's foster care system. While participation in that system might require Plaintiffs to take actions that are inconsistent with their religious beliefs, the required conduct is not targeted at any particular religion or religious belief, serves compelling state interests, and is narrowly tailored to provide safe and affirming homes for LGBTQ youth. The public interest therefore weighs in Defendants' favor.

## Conclusion

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction (ECF No. 2) is denied.

DATED at Burlington, in the District of Vermont, this 20th day of February, 2025.

/s/ William K. Sessions III
Hon. William K. Sessions III
District Court Judge